[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON APPLICATION TO CONFIRM
The principal issue presented to the court is whether paragraph two of the agreement of November 8, 1989 (copy appended hereto as Exhibit A) is a provision for appraisal or for arbitration. Because the court concludes that paragraph two is a provision for appraisal, the application to confirm must be dismissed.
On June 4, 1991 George J. Jacobs, Jr., et al., filed a two count "Application to Confirm Arbitrator's Award and Other Relief." Plaintiffs claim the following relief: CT Page 7489
1. That the award of the arbitrator be confirmed.
2. The award, pursuant to 52-408, is hereby invalid and the parties are returned to the status quo ante before the award but bound by the full value as found by the arbitrator.
3. That an order be issued directing the defendant to appear on a day certain to show cause, if any there be, why this application should not be granted.
4. That the sum of $4,072,200 plus, pursuant to General Statutes 37-3a and the said contract interest from the date of the award.
5. Specific performance of the agreement.
6. Punitive damages.
7. Money damages.
The plaintiffs have attached numerous exhibits to the application including a copy of what is, claimed to be an arbitration agreement.
The defendants assert that the application to confirm should be denied on several grounds including the primary claim that there is no "arbitration award" for the court to act upon.
"Arbitration is the voluntary submission, by the interested parties, of an existing or future dispute to a disinterested person or persons for final determination." Gary Excavating, Inc. v. Town of North Haven, 164 Conn. 119, 121 (1972); Harry Skolnick Sons v. Heyman, 7 Conn. App. 175, 179 (1986).
 An agreement in any written contract, or in a separate writing executed by the parties to any written contract, to settle by arbitration any controversy thereafter arising out of such contract, or out of the failure or refusal to perform the whole or any part thereof, or a written provision in the articles of association or by-laws of an association or corporation of which both parties are members to arbitrate any controversy which may arise between them in the future, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, shall be valid, irrevocable and enforceable, except when there CT Page 7490 exists sufficient cause at law or in equity for the avoidance of written contracts generally.
Conn. Gen. Stat. 52-408.
 "`[A] person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner which, he has agreed so to do. (Citations omitted.'") No one can be forced to arbitrate a contract dispute who has not previously agreed to do so. (Citation omitted.) The issue of whether the parties to a contract have agreed to arbitration is controlled by their intention. (Citations omitted.)
A. Dubreuil Sons, Inc., 215 Conn. at 608-09.
Although there is no particular form of words required to form an agreement to arbitrate, "the intent of the parties that arbitration be the exclusive method for the settlement of disputes arising under the contract must be clearly manifested. This express intent by both parties to enter into the arbitration agreement is essential to its existence." Domke, Commercial arbitration 5.01, p. 49. "An agreement to arbitrate must be clear and direct and not depend on implication." Harry Skolnick,7 Conn. App. at 179.
 The construction of an arbitration agreement presents a question of the intention of the parties (citations omitted.) Ordinarily, "the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact." (citations omitted.) . . . That limitation does not apply however, where the contract language is definitive, that is, where the trial court could have reasonably reached but one conclusion. (Citations omitted.)
Paine Webber, Inc. v. American Arbitration Assn., 217 Conn. 182,189-90 (1991).
Connecticut arbitration legislation is embodied in Conn. Gen. Stat. 52-408 through 52-424. These statutes provide, inter alia, for the application to the Superior Court for an order to compel arbitration (52-410); for the application to the court for an order confirming (52-417, 420) or vacating (52-418, 420) an award; and for the modification or correction of an award (52-419, 420); see also Kolenberg v. Board of Education, 206 Conn. 113, CT Page 7491 122 (1988) (cert. denied), 108 S.Ct. 2903). "An agreement to arbitrate must meet the requirements of the arbitration statute, including the requirement that the agreement be in writing, or it is invalid." Bennett, 208 Conn. at 364; see also Vincent Builders, Inc. v. American Application Systems, Inc.,16 Conn. App. 486, 488 (1988) (must follow statute); Levi v. Cosmas, 2 Conn. L. Rptr. No. 2, 46 (Thompson, J., July 2, 1990). All parties must be given formal notice of an arbitration proceeding pursuant to Conn. Gen. Stat. 52-413 even if the party already had actual notice of the scheduled hearing. Colleran v. Cassidento, 3 Conn. L. Rptr. No. 13, 412 (Pickett, J., March 1, 1991). All that is required of an arbitrator is an "award" which answers the parties' submission to the arbitrators. Millhaven v. Maryland Casualty Co., 4 Conn. L. Rptr. No. 4, 167 (McWeeny, J., May 16, 1991) citing Ramos Iron Works v. Franklin Construction, 174 Conn. 583,589 (1978).
 An award is the judgment of a tribunal selected by the parties to determine matters actually in variance between them, not merely to appraise and settle the price of property contracted for under the stipulation that this term of the contract was to be ascertained. (Citation omitted.)
The provisions of the Arbitration law are properly applicable to any contract where the parties have agreed to substitute, for the courts an informal tribunal of their choice in the settlement of a controversy, but they are not applicable where the parties have agreed only to permit third parties to decide a particular matter instead of attempting to reach an agreement themselves. (citation omitted.) Rodman, Commercial Arbitration, 2.3, p. 20 (1989).
 In an arbitration there must be some difference or dispute, in addition to the amount or value of damages, existing or prospective, between the parties, and they must intend that it should be determined in a quasi-judicial manner. That is the distinction between an agreement for an appraisal or a valuation, and an arbitration. In the case of a valuation and appraisal there is no other difference or dispute between the parties and they intend that the appraiser shall, without taking evidence or hearing arguments, make his valuation according to his own skill, knowledge and experience. CT Page 7492 (Citation omitted.)
Id. at 21.
 A reference to a third party to make an appraisement of property and the like differs in many respects from an ordinary submission to arbitration. The decision may be made without notice to or hearing of the parties, unless such notice and hearing be required by express provision and it may be made upon such principles as the person agreed on may see fit honestly to adopt, or upon such evidence as he may choose to receive.
A distinction between an arbitration award enforceable through court confirmation, and an appraisal subject only to enforcement in a separate plenary action, depends upon whether the award encompasses the entire controversy between the parties, and whether, the appropriate degree of formality attended the proceedings. Appraisers act by reason of their own knowledge and expertise, and on information they may acquire, and not necessarily on evidence of witnesses. (citation omitted.)
Id. at 22-23.
In Covenant Ins. Co. v. Banks, 177 Conn. 273 (1979), plaintiff and defendant had a fire insurance policy which contained a clause for compulsory appraisal (as required by Conn. Gen. Stat. 38-98) in the event that the parties "fail to agree as to actual cash value or the amount of loss." Defendant requested an appraisal following fire damage to his home; plaintiff refused. Defendant thereafter appointed an appraiser and had the amount of loss valued. Plaintiff brought an action to invalidate the appraisal and enjoin its enforcement. One of the issues before the court was whether the appraisal clause in a fire insurance policy constitutes a written agreement to arbitrate within the meaning of Conn. Gen. Stat. 52-411 (providing for court appointed arbitrators upon failure of contractual method provided.) The court held that any distinction between appraisal and arbitration was made prior to Connecticut's adopting arbitration statutes. Covenant Ins. Co., 177 Conn. at 279. The court further held as follows: CT Page 7493
 The normal connotation of "controversy" [in Conn. Gen. Stat. 52-408] is more than sufficient to encompass the dispute over the amount of a fire loss that triggers the appraisal procedure in the insurance contract in question. In addition, our definition of arbitration as "the voluntary submission. . . of an existing or future dispute to a disinterested person or persons for final determination"; (emphasis added.) Kantrowitz v. Perlman, 156 Conn. 224, 226, 240 A.2d 891 (1968); is broad enough to include the appraisal clause. It is important as a matter of policy to have a device that allows one party to an insurance contract to compel compliance with the policy's appraisal procedure when the other party is reluctant to proceed.
Id. at 280. See Fishman v. Middlesex Mutual Assurance Co.,4 Conn. App. 339 (1985) (holding that the provision in a homeowner's insurance policy providing for "appraisal" in the event the parties failed to agree as to the amount of loss was an arbitration clause.) See also Guiliette v. Connecticut Insurance Placement Facility, 205 Conn. 424 (1987) (holding that an "Appraisal" clause in a standard form of policy as set forth in Conn. Gen. Stat. 38-98 constitutes an arbitration agreement within our arbitration statutes.)
In Ginsberg v. Coating Products, Inc., 152 Conn. 592 (1965) (a case heavily relied upon by the court in Covenant Ins. Co. v. Banks) a stockholders' agreement was executed providing the conditions and obligations under which the stock could be sold or transferred. Paragraph eleven of the agreement provided that the price to be paid for the stock shall be based upon its value per share as set forth in the latest certificate of value. Paragraph eleven further provides that a new certificate of value shall be signed annually beginning in 1958 but that failure to do so would not invalidate the value set forth in the prior certificate. Ginsberg, 152 Conn. at 594. The parties executed certificates of value until 1960 at which time the parties failed to agree as to the value of each share. In 1963 after making a formal demand for valuation plaintiffs filed an application for an order directing defendants to proceed with arbitration.
Paragraph twenty of the stockholders' agreement provided in part, that "[a]ny controversy arising under or pertaining to this Agreement, or the interpretation, performance or breach of any provision thereof, shall be submitted to and determined by arbitration, unless relief is sought pursuant to the provisions of Paragraph 16 (specific performance)," Id. at 595. The court held CT Page 7494 that the dispute should be arbitrated under the "Any controversy" language of paragraph twenty because the dispute calls not only for a determination of the ultimate value of each share but also for the method to be used in determining that value. Id. at 595-96. The court further reasoned that "the dispute here is not merely a controversy over a simple appraisal. It is a genuine, bona fide dispute between the signatories of the stockholders' agreement and well within the meaning of [Conn. Gen. Stat.] 52-408." Id. at 596.
In Mott v. Gaer Bros., Inc., 22 Conn. Sup. 449 (Super.Ct. 1961), the parties had an agreement providing for arbitration of disputes concerning the amount of rent to be paid "[i]f this agreement is terminated at any time, resulting in the parties ceasing doing business with each other as hereinafter provided."
The court held that the agreement did not call for an arbitration within the meaning of General Statutes 52-408 but was a mere appraisal or the setting of a value. Id. at 455. The court reasoned as follows:
 In order to constitute a submission to arbitration there must be some difference or dispute, either existing or prospective, between the parties and they must intend that it should be determined in a quasi-judicial manner. Therein lies the distinction between an agreement for a valuation and a submission to arbitration, for in the case of a valuation there is not as a rule any difference or dispute between the parties and they intend that the valuer shall without taking evidence or hearing argument, make his valuation according to his own skill, knowledge or experience.
Id. at 454, quoting Matter of Fletcher, 237 N.Y. 440, 445. See Rodman, Commercial Arbitration, 2.3, p. 21 (1989).
In Harry Skolnick Sons v. Heyman, 7 Conn. App. 175 (1986), the parties submitted certain payment disputes to the construction project's architect for determination pursuant to two construction contracts executed by the parties. Upon one party's application to confirm pursuant to Conn. Gen. Stat. 52-416, the trial court held that the parties' intent was not to use the architect as an arbitrator. The trial court held that the parties intended the architect's determination to constitute a condition precedent to plaintiff's right to payment to be enforced by a plenary action based on those decisions. Id. at 179-80. The Appellate Court in affirming the trial court's decision stated that the trial court should have dismissed (rather than denied) the application on CT Page 7495 jurisdictional grounds.
In this case, based on the intent of the parties as evidenced by the words of their agreement, it is clear to the court that paragraph two calls for appraisal and not arbitration.
For the foregoing reasons, the application to confirm is dismissed.
Barry R. Schaller, Judge
EXHIBIT A
AGREEMENT
 Agreement made as of November 8, 1989 by and among Stephanie J. Jacob, and the Estate of George J. Jacob, acting herein by George J. Jacob, Jr., Trustee, hereinafter referred to as the Sellers, and
 Seaboard, Inc., a Connecticut corporation acting by George J. Bussmann, Sr., its President, hereinafter referred to as the Buyer.
WITNESSETH;
WHEREAS, Seaboard, Inc. is a Connecticut Corporation and wholly owns Cleary Millwork, Inc. and owns 88% of G. R. J., Inc.; and
WHEREAS, Sellers are owners of 264 shares of the common stock of Seaboard, Inc. ("Buyer") and desire to sell said shares to Buyer; and
WHEREAS, Buyer is willing to buy said shares from Sellers pursuant to the terms of this Agreement;
NOW THEREFORE, the parties hereto agree as follows:
1. Purchase and Sale: The Sellers shall sell to the Buyer all of the shares of stock which they own in the Buyer pursuant to the terms of this Agreement and the Buyer shall purchase from the Sellers all of such shares of stock pursuant to the terms of this Agreement.
2. Determination of Purchase Price. The Sellers shall within fourteen (14) days of the execution of this Agreement by both parties appoint an appraiser of their choice and the Buyer shall within the same period appoint an appraiser of its choice. The two (2) appraisers shall independently determine the fair market value CT Page 7496 of the Sellers' shares of stock as of September 30, 1989, the date of the most recent financial data of the Buyer. The Buyer shall provide to T. M. Byxbee Company reasonable access to all business and financial data, including without limitation, all books and financial data, including without limitation, all books and records of account; minutes of the proceedings of shareholders, directors and committees of directors; the balance sheets and profit and loss statements for the last ten (10) years; income tax returns; minutes of stockholders' meetings, by-laws, books, records, papers, contracts, journals, ledgers, books of account, and other instruments which bear on corporate conditions, on or before November 13, 1989. On or before November 30, 1989, said T. M. Byxbee Company shall request any additional information it reasonably feels is necessary, and, within One Hundred Twenty (120) days of receipt thereof, Sellers' appraiser and Buyers' appraiser shall then meet to compare their respective appraisals to arrive at a consensus as to the fair market value of the Sellers' shares of stock. If within fifteen (15) days after such meeting, the appraisers shall be unable, after making a good faith effort, to agree upon an appropriate valuation, they shall by mutual agreement within fifteen (15) additional days select a third appraiser to whom the matter shall be submitted. In the event the aforesaid appraisers are unable to agree, or if they otherwise fail to agree upon the selection of the third appraiser, then, in that event, either party may apply to the Superior Court, or to a judge thereof, to request specific performance of this Agreement, and, therefore, to have the Superior Court, or a judge thereof, appoint the third appraiser to carry out the provisions of the Agreement. Each appraiser shall meet with the third appraiser in the presence of the other appraiser, shall present to the third appraiser its appraisal and the methods it used in arriving at its valuation. Each appraiser shall be free to comment upon the method of valuation and the conclusions of the other. After giving each appraiser full opportunity to be heard, the third appraiser shall then make its own independent determination of the fair market value of the Sellers' shares of stock, which valuation shall be final and binding upon all parties. Prompt notice of the determination of the valuation shall be given to both Buyer and Seller. Each appraiser shall have full and unfettered access to all of the Buyer's business, financial and other records it may deem necessary, and to its business premises, provided that reasonable care shall be taken to avoid interference with the Buyer's business operations. The Buyer and Seller agree that each appraiser appointed hereunder shall be a member of the Business Valuation Section of the American Society of Appraisers and shall have had substantial experience in the valuation of businesses which are of the type (oil distribution and building material distribution), and of the general size (in terms of sales and assets) of the Buyer. The Buyer and Sellers shall each respectively bear the cost of their own appraiser. If it shall be CT Page 7497 necessary to have the two (2) appraisers appoint a third appraiser, the cost of the third appraiser shall be shared equally by Buyer and Sellers. Buyers further agree to pay to Sellers the sum of TWENTY THOUSAND ($20,000.00) Dollars, to be applied toward past accounting and legal expenses, said sum to be paid at closing.
3. Terms of Purchase. Within thirty (30) business days of the receipt of notice of the Purchase Price of the Sellers' shares of stock, as determined under paragraph 2 above, the Buyer shall purchase and the Sellers shall sell all of their shares of stock of Buyer. The price shall be the Purchase Price as determined